IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 8:12CV201 |
| Plaintiff, | |
| $63,530.00 IN UNITED STATES CURRENCY, | **TRIAL BRIEF** |
| Defendant. | |
| MARK A. BREWER | |
| Claimant | |

## FACTS

That on November 28, 2011, Douglas County Sheriff's Office Deputy Dave Wintle stopped a 1999 Mitsubishi Mirage for speeding on Interstate 80 westbound at 65th Street, Omaha Douglas County Nebraska. The driver and sole occupant of the vehicle was identified as Mark A. Brewer, of Schaumburg Illinois. Mr. Brewer took a seat in Deputy Wintle's patrol vehicle; Office Wintle was asked "what did you and he talk about regarding the travel?' Officer Wintle's response was "he told me he was headed out to LA to see his uncle. (T20:16-17) "Mr. Brewer told me he was recently discharged from the air force and was seeing some friends that had recently returned from Afghanistan to an Air Force Base in Colorado."(T20:5-T21:3). Officer Wintle was then asked "What else, if anything did you talk about while you're conducting the record check?"(T21:8-9). "He was a full-time student trying to get a degree in, I believe, gaming, computer gaming, video gaming, and we talked about the travel to California." (T21:12-14). Officer Wintle's response to "what if anything, happened next deputy?" "After I completed the record check, he told me that his record should be clean." "Was it?" "Yes. It didn't show any major violations or anything on there."

Deputy Wintle completed the record check and told Mr. Brewer he would not get a citation. Deputy Wintle testified that "I asked him a series of questions about the contents of his vehicle, if there was any weapons in the vehicle, any marijuana, cocaine, meth, heroin, or any large amounts of cash in the car, over $10,000.00." (T23:11-14) that 'most of the answers were no, and Then when I asked him about the money in the vehicle there was a little delay and I believe it was ore of an, ahh, no."(T23:19-21)

Deputy Wintle "I asked him if it was okay if I had walked canine Kubo around his car and he said it would be." (T24:1-2) ""on the driver's side I noticed that Kubo was alerting on the side of the vehicle. (T24:10-11). "And when I reached the trunk he indicated to an odor of narcotics coming form the trunk. (T24:14-15) Deputy Wintle placed Kubo back in the cruiser. As soon as Deputy Wintle returned to the driver's seat, Mr. Brewer asked about training Kubo and what was involves. Deputy Wintle asked Mr. Brewer if there was any reason why Kubo would indicate to the odor of narcotics coming from the vehicle. Mr. Brewer initially said no, but said his man purse with the IPad in it might have been around something a few weeks ago.

Deputy Wintle stated "I began a search of the trunk. There was---I saw two backpacks there. One of them I opened. As soon as I opened it I could smell a strong odor of raw marijuana coming out of the backpack." (T25:21-25, T26:1). "I looked in there and saw a plastic grocery type sack. It was actually three bags that were holding its contents. I had to rip through those. Inside there I found bundles of United States currency, rubber-banded bundles. (T26:2-8). Officer Wintle testified that after he searched Mr. Brewer's vehicle that "I smelled myself a strong odor of raw marijuana, but did not find any drug itself, no." When he was asked if it was "common knowledge and part of your training you were told and educated that United States currency oftentimes smells like drugs or narcotics." He stated that "My training is that there are

studies out there that some United States currency may contain residual cocaine on it. The odor itself is still there."

I "put the currency back into the trunk, returned to the passenger side, talked to Mr. Brewer and asked him about the money. He told me there was $63,550.00 there and it was money to be used for a down payment on a house."(T26:13-17).  Mr. Brewer testified that "I was on my way to but a home at a discounted rate, so I got my paperwork together and emptied my safe and put it in a backpack and started to drive to LA to purchase a house."  (T63:3-6) When asked, "Did you find anything else in that search that was significant to you?" Officer Wintle replied, "Yes, I found print-outs on how to make hash oil, a couple documents on how to make hash, hash oil. When asked if possession of an article from "Cannabis Culture Magazine" is illegal, he responded "no." (T48:13-14) and admitted that it was a nine year old article. (T49:14) Also, in Mr. Brewer's pocket approximately a thousand dollars in cash.  He had originally told me there was eight hundred dollars, we counted it there was about a thousand." (T26:25-T27:1-8).

When asked  "Deputy, upon finding the money in Mr. Brewer's vehicle, did he tell you there were documents in his vehicle that would support where that money came from?" Officer Wintle replied "Yes. He said he would be able to clear everything up. He had documents to show where all this money came from." When asked "what were the documents, or do you remember?" his reply was "I don't recall.  The only documents I found that looked of any significance was a tax return from 2009, his gross income was around nineteen thousand." (T33:21-25, T34:1-8).   Officer Wintle admitted that "yes, there was a couple, looks like pay stubs in here, a possibly, a 2008 tax return, in addition to some bills and I believe notices of a

late payment on a rental unit." Which he takes into account as an indicator of the source of the funds.

When asked about interdiction training and traffic stops and indicators, officer Wintle replied, "An indicator is an item or items that alone by themselves are not illegal and are fairly innocent, but when you put them all together indicators start telling you a little bit of a story and can help show that there may be some crime occurring here, someone trying to cover up a crime that is occurring. The indicators help separate the criminal element from the innocent motoring public that I encounter out there." (T34:14-22). When asked "Is money ever an indicator?" Officer Wintle replied "Money itself, No., just having cash by itself is not an indicator. Having the currency bundled in a particular way, the way it's hidden, the way its being transported, that then becomes an indicator." (T34:23-25, T35:1-4). Officer Wintle indicated that the claimant Mark Brewer had no prior criminal history. He was asked, "you don't defer any importance to a person's lack of criminal history?" Officer Wintle response. "No not a lot." "Is possessing money illegal?" officers reply "No." ((T37:24-25, T38:1-3).

Officer Wintle was asked if he had any "actual knowledge as the source of that money?" he responded "No." (T38:13-15). The claimant Mr. Brewer testified that "I was a military police officer and weapons specialist and was medically discharged in June of 2008". (T57:14-17) "I was receiving treatment for bipolar depression, as well as symptoms of bi-polar disorder, which I was given medication and discharged from the military for." (T64:19-23) The claimant also testified that the source of the money was his pay from the United States Air Force and military disability pay for his post traumatic stress disorder for which he was diagnosed shortly after getting out of the military. (T57:22-25). Mark Brewer received "the good conduct medal,

4

national defense service medal, and global war on terrorism service medal as part of his decorations during his military service." (T77:2-6)

Mr. Brewer stated that his post traumatic stress disorder was caused by "My deployment to Afghanistan in 2007."(T58:6-7). When asked about his post traumatic stress disorder symptoms, he stated that "I had a serious distrust of any government entity, so anything having to do with the government, post office, banks, anything having to do with government." I had issues with anger and losing my temper, and I also had problems concentrating." (T59: 5-9) "After my deployment I began hoarding money. I would take my payment that I get from the military and because I had a military bank I would actually take it out in cash and I would put the money in a safe at home." (T59:22-25) "My uniforms were paid for, my food was paid for, and my lodging was paid for. So, every dime that I made while I was in the military was my money and I saved anywhere from 70 to 90 percent of my pay on any given month. I had a little over $35,000.00 when I got out of the military." (T60:9-13, T60:24-25). Mr. Brewer also testified that when he got out of the military in 2008 he got a lump sum payment from the department of veterans affairs. He indicated the amount was $11,538.00. (see Ex. 112) When he asked what he did with that check he stated "I cashed that check. Once I got the cash together I bundled it up in thousand dollar increments." (T61:12-19) Mr. Brewer was also asked "what is the reason why all your income is not shown on the tax return. He responded, "The government does not tax itself, so when they pay you disability it's not taxable income and it's not anything I have to declare." (T62:4-6)

Mr. Brewer was asked "is this money somehow connected with a violation of the controlled substance laws of the United States of America? His reply was "No, its not." (T76:16-18).

5

The claimant introduced at trial Exhibit 101 which was the notice of seizure to claimant dated February 29, 2013, Exhibit 102, the claimants letter to the forfeiture counsel dated March 12, 2012, along with Exhibit 103, the certified mail return receipt showing date of delivery as March 23, 2012, and Exhibit 104 the USPS track and confirm certified mail letter to the Forfeiture counsel. The Plaintiff filed their Complaint in Rem Exhibit 105 which alleged in purely conclusory fashion that the Defendant property is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; or 3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act. The claimant filed a verified claim which was shown to the court as Exhibit 106, and an answer to the Complaint in Rem as Exhibit 107. Exhibit 108 was introduced showing the claimants Certificate of Release or Discharge from Active Military Duty and evidencing his good conduct medal, national defense service medal, and global war on terrorism service medal as part of his decorations during his military service. The claimant introduced into evidence Exhibit 109 which are the police reports of the incident. The claimant withdrew from classes at Harper College due to his post traumatic stress disorder as evidenced by Exhibit 110 and evidencing he was receiving treatment given medication and discharged from the military. The claimant introduced evidence as Exhibits 111 and 112 from the Department of Veterans Affairs regarding his service related compensation and receipt of the net amount of $11,538.00 and an itemization of his bank transactions from November 7, 2007 to September 4, 2012 as Exhibit 113 and the correlating bank statements as Exhibit 114 showing cash and ATM withdrawals from the claimants bank in the amount of $64,664.11. Lastly the claimant

introduced as Exhibit 115, the USPS track and confirm notice of January 9, 2012 Notice of seizure letter to the claimant.

## I.

**THE GOVERNMENT HAS FAILED TO SHOW BY A PREPONDERANCE OF THE EVIDENCE, A SUBSTANTIAL CONNECTION EXISTS BETWEEN THE DEFENDANT PROPERTY AS EITHER INTENDED TO BE FURNISHED BY ANY PERSON IN EXCHANGE FOR A CONTROLLED SUBSTANCE, IS PROCEEDS TRACEABLE TO SUCH AN EXCHANGE, OR WAS INTENDED TO BE USED TO FACILITATE A CONTROLLED SUBSTANCE OFFENSE.**

Certain currency is forfeitable to the United States pursuant to Title 21, United States Code, § 881(a)(6): "All monies . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all monies . . . used or intended to be used to facilitate any violation of [controlled substances used in violation of Title 21]." Since the enactment of the Civil Asset Forfeiture Reform Act of 2000, the burden is on the government to establish, by a preponderance of the evidence that seized property is subject to forfeiture. 18 U.S.C. § 983(c)(1). "Forfeiture is warranted under 21 U.S.C. § 881 when the government establishes a 'substantial connection' between the property and a controlled substance offense. 18 U.S.C. § 983(c)(3)." United States v. $124,700 in U.S. Currency, 458 F.3d 822, 825 (8th Cir. 2006) (internal quotation marks omitted).

"In a forfeiture action under 21 U.S.C § 881, the United States bears the initial burden of establishing by a preponderance of the evidence that the property is substantially connected to drug trafficking. 18 U.S.C. § 983(c)(1) and § 983(c)(3). Circumstantial evidence can be used by the United States to establish its burden of proof." United States v. $84,615.00 in U.S. Currency,

379 F.3d 496, 501 (8th Cir. 2004), United States v. $1,074,900.00 in U.S. Currency, 8:12cv297 (D.Neb.2013). There is no evidence that these proceeds, i.e., the money, is traceable to any drug transactions. In the present case Officer Wintle was asked if he had any "actual knowledge as the source of that money?" he responded "No." (T38:13-15).There is no direct evidence to link this money with drug transactions, other than the dog sniff. Further, the government offered no statistical support for the dog sniff. For example, how often would a dog not alert to a large quantity of cash? Judge Beam has determined that nearly all money is tainted with the odor of drugs. Muhammed v. Drug Enforcement Agency, 92 F.3d 648, 653 (8th Cir. 1996). The court would have appreciated some objective statistical information regarding the correlation to quantity of drug-positive sniffs and amount of money seized. There was no evidence offered in this regard. For all the court knows, there is a 90% chance that all money is drug tainted. There simply is no quantification, and all the sniff evidence offered is anecdotal. As stated by the Justice Stevens in his dissenting opinion:

> Without some form of an exception for innocent owners, the potential breadth of forfeiture actions for illegal proceeds would be breathtaking indeed. It has been estimated that nearly every United States bill in circulation—some $230 billion worth—carries trace amounts of cocaine, so great is the drug trade's appetite for cash.

Bennis v. Michigan, 516 U.S. 442, 460 n. 1 (1996) (dissenting opinion of Justice Stevens). United States v. $1,074,900.00 in U.S. Currency, 8:12cv297 (D.Neb.2013).

In the present case when asked "Is money ever an indicator?" Officer Wintle replied "Money itself, No., just having cash by itself is not an indicator. Having the currency bundled in a particular way, the way it's hidden, the way it's being transported, that then becomes an

8

indicator." (T34:23-25, T35:1-4). Officer Wintle indicated that the claimant Mark Brewer had no prior criminal history. He was asked, "You don't defer any importance to a person's lack of criminal history?" Officer Wintle response. "No not a lot." "Is possessing money illegal?" officers reply "No." (T37:24-25, T38:1-3).

Claimant Mark Brewer provided his bank statements from November 7, 2007 to September 4, 2012 showing cash withdrawals by automatic teller machine amounting to $64,664.11. He also provided Exhibits 111 and 112 from the Department of Veterans Affairs regarding his service related compensation and receipt of the net amount of $11,538.00. The claimant Mr. Brewer testified that "I was a military police officer and weapons specialist and was medically discharged in June of 2008". (T57:14-17) "I was receiving treatment for bipolar depression, as well as symptoms of bi-polar disorder, which I was given medication and discharged from the military for." (T64:19-23) The claimant also testified that the source of the money was his pay from the United States Air Force and military disability pay for his post traumatic stress disorder for which he was diagnosed shortly after getting out of the military. (T57:22-25). Mark Brewer received "the good conduct medal, national defense service medal, and global war on terrorism service medal as part of his decorations during his military service." (T77:2-6)

Mr. Brewer stated that his post traumatic stress disorder was caused by "My deployment to Afghanistan in 2007."(T58:6-7). When asked about his post traumatic stress disorder symptoms, he stated that "I had a serious distrust of any government entity, so anything having to do with the government, post office, banks, anything having to do with government." I had issues with anger and losing my temper, and I also had problems concentrating." (T59: 5-9) "After my deployment I began hoarding money. I would take my payment that I get from the

9

military and because I had a military bank I would actually take it out in cash and I would put the money in a safe at home." (T59:22-25)   "My uniforms were paid for, my food was paid for, and my lodging was paid for. So, every dime that I made while I was in the military was my money and I saved anywhere from 70 to 90 percent of my pay on any given month.   I had a little over $35,000.00 when I got out of the military." (T60:9-13, T60:24-25).  Mr. Brewer also testified that when he got out of the military in 2008 he got a lump sum payment from the Department of Veteran's Affairs.  He indicated the amount was $11,538.00. (See exhibit 112) When he asked what he did with that check he stated "I cashed that check. (T61:12-19) Once I got the cash together I bundled it up in thousand dollar increments." Mr. Brewer was also asked "what is the reason why all your income is not shown on the tax return.  He responded, "The government does not tax itself, so when they pay you disability it's not taxable income and it's not anything I have to declare." (T62:4-6)

      Mr. Brewer was asked "is this money somehow connected with a violation of the controlled substance laws of the United States of America? His reply was "No, its not." (T76:16-18).  Mr. Brewer testified that "I was on my way to but a home at a discounted rate, so I got my paperwork together and emptied my safe and put it in a backpack and started to drive to LA to purchase a house."  (T63:3-6).

      The government failed to show a substantial connection between drugs and the money. In general, the government left too many unanswered questions and had a general failure of proof in this case. The only reasonable conclusion that the court can make is that the evidence presented by the claimant is reliable. "Lots of money" is not a sufficient basis in and of itself generally for forfeiture. The dog sniff is inconsequential. Further, there is just an overall lack of evidence to support the government's burden in this regard. There is no nexus between the currency and any

illegal activity. See United States v. $124,700, 458 F.3d 822 (Judge Lay dissenting) (wherein Judge Lay lists cases requiring a nexus to drug activity). United States v. $1,074,900.00 in U.S. Currency, 8:12cv297 (D.Neb. 2013).

## II.

**WHETHER THE CLAIMANT MARK BREWER IS AN INNOCENT OWNER OF THE DEFENDANT PROPERTY WITHIN THE PURVIEW OF 18U.S.C. §983(D)**

If the government meets its burden, in order to avoid forfeiture the claimant has the burden of proving by a preponderance of the evidence that he is an innocent owner. 18 U.S.C. § 983(d)(1). An "innocent owner" is defined as "an owner who (i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). As used in the civil forfeiture statute, an owner is defined as

(A) A person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest; and

(B) Does not include—

. . . .

(iii) a nominee who exercises no dominion or control over the property.

18 U.S.C. § 983(d)(6).

The statute defines the term "owner" to include "a person with an ownership interest in the specific property sought to be forfeited," and to exclude "a nominee who exercises no dominion

11

or control over the property." 18 U.S.C. § 983(d)(6)(A) and (B); United States v. One Lincoln Navigator, 328 F.3d 1011, 1014 (8th Cir. 2003) (emphasis in original).

A claimant "need not prove the underlying merits of the claim. "United States v. 7725 Unity Ave. N., 294 F.3d 954, 957 (8th Cir. 2002) (citation omitted). Instead, "a claimant need only show a colorable interest in the property, re-dressable, at least in part, by a return of the property." Id. A "colorable ownership interest 'may be evidenced in a number of ways including showings of actual possession, control, title and financial stake.'" United States v. One Lincoln Navigator, 328 F.3d at 1013 (quoting United States v. One 1945 Douglas C-54 (DC-4) Aircraft, 647 F.2d 864, 866 (8th Cir. 1981)).

Mark Brewer testified was asked "why keep the bundles in a thousand dollars each?" "easy to count" was his reply. "Just like the deputy testified.  When Mr. Brewer was asked, "How long had you been doing that, bundling it in a thousand bucks?" he responded "Since after my deployment to --- actually when I deployed to Afghanistan I was still doing it."  When asked where he was keeping it in Afghanistan he replied "I had an area in my drawer that I put it in and hid it.  I also had my own room, so I locked it up." (T89:3-13).  Mr. Brewer testified as follows regarding the plastic bags the money was located in:

Q. "so you got in your car, correct?"

A. "yes."

Q. "You threw the money in the car, correct?"

A. "yes."

Q. "You had it in a plastic bag is that right?"

A. "yes"

Q. "Any significance to that plastic bag?"

12

A. " no, not at all?

Q: "And it's just a grocery sack right?"

A. "Yes.  (T75:10-19)

In <u>United States v. $1,074,900.00 in U.S. Currency,</u> 8:12cv297 (D.Neb. 2013) the money was banded with rubber bands and hair ties in $10,000.00 bundles and placed in plastic bags in a motor vehicle. And the Court found that the Government failed to show a substantial connection between drugs and the money.

### III.

**THE GOVERNMENTS FORFEITURE CLAIM IS VOID AND UNENFORCEABLE AS VIOLATIVE OF THE UNITED STATES CONSTITUTION, IN THAT FORFEITURE OF CLAIMANTS INTEREST IN THE SUBJECT PROPERTY WOULD AMOUNT TO A CRUEL AND UNUSUAL PUNISHMENT AND AN EXCESSIVE FINE, BOTH IN VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

The Eighth Amendment states that " [e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. For many years, the contours of the Excessive Fines Clause went unexplored by the Supreme Court. Until 1998, the Court had never applied the Clause to hold that a particular fine was excessive. Bajakajian,

524 U.S. at 327, 118 S.Ct. 2028.

The Supreme Court's first case dealing with the potential application of the Excessive Fines Clause to civil in rem forfeitures was Austin v. United States, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In Austin, the claimant was indicted in South Dakota for drug distribution, and the government initiated a civil in rem forfeiture proceeding against his mobile home and an

13

automobile repair shop that he owned and that were allegedly connected to his drug trafficking offenses. Id. After canvassing the early history of both the Clause and of forfeiture proceedings, the Supreme Court held that the proper question was not "whether forfeiture under [the statute then at issue] is civil or criminal, but rather whether it is punishment." Id. at 610, 113 S.Ct. 2801. The Court stated that a forfeiture may count as a "fine" — that is, a "payment to a sovereign as punishment for some offense," Browning-Ferris Indus. v. Kelco Disposal, 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)— even if the forfeiture was in part remedial. Austin, 509 U.S. at 621, 113 S.Ct. 2801. Instead, if the forfeiture "cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, [it] is punishment." 681 F.3d 1111.  United States of America, Plaintiff-Appellant, v. Maria Ferro, Claimant-Appellee, and Robert Ferro, Claimant, and 1,679 Firearms; 87,983 Rounds of Ammunition; 3 Airburst Projectiles; Assorted Fuses, Defendants. 681 F.3d 1105 (9th Cir. 2012).

## IV.

**THE GOVERNMENT IS NOT ENTITLED TO FORFFEITURE FOR FAILURE TO TIMELY FILE THE COMPLAINT IN REM AND IS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS**

That the claimant previously filed a Motion to Dismiss and Brief in Support thereof as filing number 20 and the Court has entered an order overruling the Motion to Dismiss.  To the extent necessary to preserve this issue the claimant incorporates his Motion and Brief In Support of Motion to Dismiss as fully set forth.

## CONCLUSION

For the foregoing reasons the claimant Mark Brewer is entitled to judgment directing the United States government to return to his $63,530.00 in United States currency or the equivalent

14

in a check, interest paid to the United States from the date of seizure or arrest of the property that resulted from the investment of the property in an interest bearing account or instrument; and an imputed amount of interest that such currency instruments or proceed would have earned at the rate applicable to the 30-day treasury Bill, for any period which no interest was paid, plus post-judgment interest as set forth in 28 U.S.C. 1961 and attorney fees.

                                            MARK A. BREWER, Claimant,

                                        By:   s/Casey J. Quinn
                                               Casey J. Quinn, #17396
                                               209 S. 19th Street, #540
                                               Omaha, NE 68102
                                               (402) 346-2500
                                               Email: attyquinn@aol.com
                                               Attorney for Claimant

## CERTIFICATE OF SERVICE

       I hereby certify that on 12/13/13, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following: Nancy A. Svoboda, Assistant U.S. Attorney.

                                                         s/Casey J. Quinn